# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 20-0243V
UNPUBLISHED

| | |
|---|---|
| CHARRIE ANN GIBSON, | Chief Special Master Corcoran |
| Petitioner, | |
| v. | Filed: October 5, 2022 |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | Special Processing Unit (SPU); Influenza (Flu); Shoulder Injury Related to Vaccine Administration (SIRVA); Table Injury; Entitlement to Compensation; Damages; Pain and Suffering; Medical Mileage. |
| Respondent. | |

*William E. Cochran, Jr.*, Black McLaren, et al., PC, for Petitioner.

*Zoe Wade*, U.S. Department of Justice, Washington, DC, for Respondent.

### RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES[1]

On March 4, 2020, Charrie Ann Gibson filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that she suffered a shoulder injury related to vaccine administration ("SIRVA") causally related to an influenza ("flu") vaccine received on October 1, 2018. *See* Petition. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters. The parties have disputed entitlement, as well

---

[1] Because this unpublished opinion contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the opinion will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

as the proper damages to be awarded for her claimed Table SIRVA assuming a favorable entitlement ruling for Petitioner.

For the reasons set forth below, Petitioner's Motion for a Ruling on the Record (ECF No. 49) is **GRANTED.** Petitioner is entitled to compensation for a Table SIRVA, and she is awarded reasonable compensation in the amount of **$77,187.31 (representing $75,000.00 for actual pain and suffering and $2,187.31 for actual unreimbursed expenses).**

### I. Relevant Procedural History

Two days after filing her petition, Ms. Gibson filed the supporting documentation required under the Vaccine Act. Exhibits ("Exs.") 1-11; *see* Section 11(c). That same month, the case was activated and assigned to the SPU (OSM's adjudicatory system for attempting to resolve cases deemed likely to settle). ECF No. 9. Petitioner subsequently filed additional medical records and one supporting witness affidavit (Exs. 12-18). The parties engaged in settlement discussions before reaching an impasse at the end of 2021. Status Reports (ECF Nos. 27-40).

Thereafter, in January 2022, Respondent filed his formal report opposing compensation for a Table SIRVA, on the grounds that Petitioner had not established several of the required criteria (detailed in the below analysis). Rule 4(c) Report (ECF No. 29) at 11-12. I instituted a briefing schedule covering both entitlement for a Table SIRVA and (in the event that Petitioner prevailed) an appropriate award of damages for the same. Scheduling Order (Non-PDF) entered April 27, 2022.

On May 27, 2022, Petitioner filed her supplemental affidavits (Exs. 19, 21), updated medical records (Ex. 20), and a Motion for a Ruling on the Record ("Motion") (ECF No. 49). On June 27, 2022, Respondent filed a Response (ECF No. 50). On July 12, 2022, Petitioner filed her Reply (ECF No. 51). Petitioner's Table claim is now ripe for adjudication.[3]

### II. Relevant Factual Evidence

I have fully reviewed the evidence, including all medical records and affidavits, Respondent's Rule 4(c) report, and the parties' briefing. I find most relevant the following:

---

[3] From the start of proceedings, Petitioner has preserved an alternative claim of injuries caused in fact by the flu vaccine. Petition (ECF No. 1); Status Report (ECF No. 42); Motion at n. 1. Respondent's Rule 4(c) Report does not address this alternative. I determined to first resolve whether Petitioner could establish a Table SIRVA claim, warning that if she was unsuccessful, the case could be transferred out of the SPU. Scheduling Order filed February 22, 2022 (ECF No. 43).

- **Pre-Vaccination History.** In the three years prior to the subject vaccination, Ms. Gibson did not have a regular primary care provider and she obtained very limited medical care. However, the parties debate the relevance of that pre-vaccination care to Petitioner's Table SIRVA claim.

- On March 20, 2017,[4] upon establishing primary care with Rachel Beda, M.D., Petitioner reported "neck ROM limited turning to the L, thinks it is from stress, no major trauma." Ex. 9 at 5. Petitioner elaborated on her stress and anxiety, which stemmed from a new teaching position. *Id.* Dr. Beda did not record any abnormal findings on physical exam. *Id.*[5] The assessments were 1) anxiety and 2) panic disorders, both to be treated with prescription medication and lifestyle changes; and 3) neck pain representing "cervicalgia," which was "almost certainly a side effect/ complication of the stress [Petitioner] is experiencing at work currently," to be treated with heat, stretching, and formal massage therapy. *Id.* at 6.[6]

- Petitioner attended a total of five (5) massage therapy sessions. She reported on a handwritten intake form: "Limited range in neck movement. Muscle pain neck, front and back. Muscle pain mid back and shoulders." Ex. 4 at 11.[7] On March 31, 2017, the therapist recorded: "[R]elief lasting for about 4-5 days after last tx. Tension back up to constant L – M., esp. in between shoulder blades, w/ migration to lower back." *Id.* at 16.[8] On April 7th, the therapist recorded: "[C]hronic discomfort through UB and Nk mostly on L side still persisting, 5-6/10 in last week." *Id.* at 7. On April 21st, Petitioner had improvement, but still rated her back as 5/10, specifically noting "tight[ness] in upper to lower back." *Id.* at 18. After a two-month gap, Petitioner returned for a final session on June 22nd, on which date she was

---

[4] Respondent inadvertently stated that this encounter occurred on March 30, 2017. Rule 4(c) Report at 2. Petitioner adopted that same error. Brief at 2.

[5] There are no findings pertaining to the neck, shoulders, or arms. The musculoskeletal system findings read: "Neuro NO TREMOR and FACIES SYMMETRIC." Ex. 9 at 5.

[6] Dr. Beda instructed Petitioner to follow up in one month "if sx worsen or don't improve." Ex. 9 at 6. However, they had no further encounters.

[7] Billing records suggest that the first massage therapy session occurred on March 24, 2017. Ex. 4 at 1. However, there are no chart records from that date, *see generally* Ex. 4. Both parties state that the first session was on March 20, 2017. Rule 4(c) Report at 2; Brief at 2.

[8] Within each massage session record, the "Objective" section primarily consists of abbreviations, e.g., "HT BL (L<R) upper thoracic esg's; ilocostalis; multifidi>w/DT/MEFT/mm strip/XFF." Ex. 4 at 16. The parties did not address the significance of these notations throughout the medical records.

3

recorded to have: "[N]eck and shoulder tension, L>R side, w/some restricted ROM – rotation – to left side." *Id.* at 19. Petitioner was instructed to continue massage sessions "as needed." *Id.* However, she did not have any further massage or primary care encounters over the next fifteen (15) months. *See* Exs. 2, 4, 9.

- ***Vaccination and Subsequent History.*** On October 1, 2018, Petitioner received the subject vaccination in her left deltoid muscle at a pharmacy. Ex. 15 at 5-6.

- Petitioner has submitted time-stamped photographs from the following evening, which evidence bruising on her left upper arm. Ex. 11.[9]

- Approximately four months after vaccination, on February 6, 2019, Petitioner established with a different primary care provider, Kathleen Barnes, M.D. (hereinafter referred to as "the PCP"). Ex. 2 at 7-25. The PCP recorded Petitioner's concerns as: "*Joint pain:* Both elbows. Both hips. Both shoulders. Might be starting in knees. Wrists, feet OK. Pain tends to travel, not always in the same place. Yoga seems to help a lot. Not taking medication for her pain." Ex. 2 at 15-16.

- On physical exam, the PCP recorded that both shoulders had normal range of motion ("ROM"), strength, and no tenderness to palpation. Ex. 2 at 17. She recorded that the bilateral elbows were tender to palpation and provocative movements caused discomfort. *Id.*

- The PCP assessed "bilateral shoulder pain, unspecified chronicity, likely MSK [musculoskeletal]," to be treated with massage therapy. Ex. 2 at 18; *see also* Ex. 4 at 21 (referral with diagnostic code "M2551 Pain in Shoulder"). She also assessed "medial epicondylitis of elbow, unspecified laterality," to be treated with home exercises. Ex. 4 at 18.[10]

- During the primary care encounter, a physician assistant ("PA") is recorded to have administered a tetanus-diphtheria-acellular pertussis ("Tdap") vaccine in

---

[9] Petitioner and another fact witness's affidavits (Exs. 1, 16, 19) discuss the bruising, as summarized below.

[10] Petitioner recalled that as a result of her left shoulder pain, she was "doing things differently" with her left elbow, resulting in secondary pain in her left elbow. Ex. 2 at 46 (July 28, 2019, email to PCP); Ex. 1 at ¶ 16 (affidavit).

4

Petitioner's left deltoid muscle – the same site of injury as the subject flu vaccine. Ex. 2 at 7.[11]

- On March 14, 2019, Petitioner started massage therapy[12] for "L shoulder pain since last October after receiving flu shot. ROM limited w/ abduction, post. extension, w/ mm tension. Left elbow tight and sore." Ex. 4 at 23. On March 22nd, Petitioner reported that massage had delivered "much improvement." *Id.* at 24. On April 4th, she reported that the last treatment had delivered about 5 days of "relief," and that her pain was "slowly improving." *Id.* at 25.

- On May 29, 2019, Petitioner started chiropractic treatment.[13] She reported that after the October 2, 2018, flu vaccination, she had developed left shoulder bruising, musculoskeletal pain, and joint pain. Ex. 6 at 3, 10. She could not "lift arm to full range." *Id.* at 3. The pain interfered with daily activities and sleep, and was always present, although massage provided "temp[orary] relief" for "2-3 days." *Id.* The pain was 6/10 at best and 10/10 at worst. *Id.* The chiropractor recorded: "also cervicothoracic tension, intermittent, left, aggravated by driving, random activities of daily living, alleviated with rest." *Id.* at 10. The chiropractor diagnosed dysfunction in one upper extremity, as well as in the thoracic, cervical, lumbar, and pelvic spinal regions. *Id.* He performed a chiropractic adjustment which was well-

---

[11] Petitioner acknowledged receipt of a second vaccination in her allegedly injured left arm. Motion at 4; *see also* Ex. 2 at 46 (recalling that she did not "want [her right arm] messed up too").

[12] After vaccination, Petitioner attended a total of 29 massage therapy sessions - specifically on March 14; March 22; April 4; June 27; July 5; July 24; July 31; August 12; August 20; August 29; September 5; September 19; September 23; October 1; October 8; October 18; October 22; October 31; November 8; November 15; December 5; December 14; and December 19, 2019. Ex. 4 at 19-25; Ex. 5 at 9-38. Further sessions occurred the following year, specifically on February 13; February 25; and March 12, 2020. Ex. 14 at 17-18. Petitioner received one additional massage therapy session from a new provider on May 17, 2021. Ex. 18 at 1.

As noted above at note 7, *supra*, the massage records contain considerable abbreviations, which the parties have not addressed. However, it is evident that the sessions in early 2017 addressed bilateral complaints, while the sessions beginning in 2019 were focused on the left upper body. *See generally* Ex. 4.

[13] Petitioner attended a total of 10 chiropractic sessions. Those sessions were on May 29; June 3; June 7; June 10; June 14; June 19; June 26; July 2; July 12; and July 26, 2019. Ex. 6 at 9-35.

5

- tolerated. Ex. 6 at 10; *see also id.* at 37-38 (intake forms acknowledging that chiropractic care was limited to addressing vertebral subluxation[14]).

- Petitioner reported symptoms improvement during the first five chiropractic appointments. Ex. 6 at 12-24. Then on June 19, 2019, the chiropractor recorded that Petitioner "took a yoga class this weekend where they performed micromovements in the joints and her shoulder feels significantly better… overall she is feeling better since her last treatment." *Id.* at 22. On June 26, 2019, the chiropractor recorded that Petitioner experienced "significant aggravation to left glenohumeral joint (shoulder) with awkward movement." *Id.* at 25.

- On July 5, 2019, Petitioner returned to the PCP's practice, where a physician assistant ("PA"), recorded: "Left shoulder pain and decreased ROM. History of left shoulder pain but has been treated for chiropractor and massage therapy (Jan 2019). Two weeks ago, symptoms started again after doing a pulling motion. Prior to this incident she was at a yoga retreat." Ex. 2 at 29. On exam, the PA documented no tenderness or weakness, but decreased ROM and positive impingement signs. *Id.* at 28. Petitioner was assessed with tendinitis, for which she was given a home exercise regimen and referrals to acupuncture, physical therapy, and a sports medicine specialist. *Id.* at 28; Ex. 3 at 74.

- Also on July 5, 2019, the massage therapist recorded "3 days of relief after last tx. Ache and tension back up to 7/10 today, in left shoulder." Ex. 4 at 27.

- On July 9, 2019, Petitioner started acupuncture treatment.[15] She indicated the "main source of pain" as her left shoulder, with "secondary" pain in her left scapula, both present since October. Ex. 7 at 3-4. The pain was currently 5-6/10, occasionally rising to 9/10. *Id.* at 9. On exam, left shoulder abduction was limited to 70 degrees. *Id.* There were adhesions in the supraspinatus, infraspinatus, trapezius, and rhomboid attachment at the left medial scapula. *Id.*

---

[14] The intake forms define vertebral subluxation as "a misalignment of one or more of the 24 vertebrae in the spinal column which causes alteration of nerve function and interference to the transmission of mental impulses." Ex. 6 at 38.

[15] Petitioner attended a total of 17 acupuncture sessions on July 9; July 15; July 25; July 30; August 5; August 19; September 9; September 16; September 30; October 14; October 21; October 28; November 4; November 12; December 16, 2019; January 2; and January 13, 2020. Ex. 7 at 9-17; Ex. 13 at 7-11.

- On July 12, 2019, the chiropractor recorded that Petitioner's left shoulder had "continued aggravation," remaining "about the same or worse" as at previous appointments. Ex. 6 at 29.

- On July 24, 2019, a sports medicine specialist, Ty C. Jones, M.D., recorded that Petitioner "had been referred by [the PA seen on July 5, 2019] for consultation regarding her left shoulder pain." Ex. 4 at 74. He echoed the history that Petitioner "presented on 7/5/19 with left shoulder pain intermittently since the beginning of the year that improved with massage in January, but then started again 2 weeks prior to that visit after a pulling motion." *Id.* Dr. Jones then recorded that "In our interview, [Petitioner] notes that the pain started shortly after getting a flu shot that was given high on her deltoid. She initially developed pain deep to the anterior shoulder, and over time has also been losing ROM. The pain is minimal at rest but sharp and severe at the limits of ROM," rating 11/10. Ex. 3 at 74. An x-ray demonstrated acromioclavicular arthropathy. *Id.* Dr. Jones assessed left shoulder adhesive capsulitis for which he administered a corticosteroid injection to her left glenohumeral joint, provided home exercises, and referred to physical therapy ("PT"). *Id.* at 75.

- On July 28, 2019, Petitioner emailed the PCP, reporting dissatisfaction with her treatment to date. Ex. 2 at 46. Petitioner reported that on February 2nd, her chief concern had been left shoulder pain since the flu vaccine, with secondary left elbow pain "because [she] was having to do things differently." *Id.* Petitioner denied endorsing other areas of pain. *Id.* Petitioner also wrote: "You [the PCP] even asked me if I was scared to get the tetanus shot on that visit, and I said yes, I didn't want it in my right arm because I didn't want that one messed up too." *Id.* The specific PCP was out of the office; a physician colleague responded to the email and assisted Petitioner's transfer to a new practice. *Id.* at 45; *see also* Ex. 3 at 129-31 (new patient evaluation).

- After the chiropractic course ended, on August 2, 2019, the chiropractor noted: "shoulder pain should be primary diagnosis, with thoracic subluxation and dysfunction being corollary" without any further explanation. Ex. 6 at 32.

- Petitioner started PT on the first available date, August 6, 2019. Ex. 2 at 54. She reported a similar history dating back to the flu vaccination, that the cortisone injection had "helped immensely," and that her current pain was "minimal at rest but sharp and severe at the limits of ROM," rising to 7-8/10. Ex. 3 at 105. The assessment was adhesive capsulitis with "expected limits in ROM with pain at end

7

range." *Id.* at 106. Petitioner was given home exercises and instructed to return "every other week for 2 sessions." *Id.* at 108-10.

- On August 20, 2019, Petitioner emailed the sports medicine specialist reporting improved ROM with PT but increasing pain and concern that the cortisone injection was wearing off. Ex. 2 at 54.

- At her 2nd PT session on August 21, 2019, Petitioner reported increased pain (rated at 11/10), but demonstrated "very gradual" improvements in ROM. Ex. 3 at 111-13. At her 3rd and final PT session on September 3, 2019, she reported "no significant change in pain levels." *Id.* at 117-19.

- On September 10, 2019, an MRI of the left shoulder visualized adhesive capsulitis; minimal to mild supraspinatus tendinosis; and medial subluxation of the long head of the biceps tendon. Ex. 3 at 155-56. That same day, Petitioner emailed the sports medicine specialist, reporting that the MRI was "incredibly painful" and she "was crying halfway through it." Ex. 3 at 92. She had changed from ibuprofen (e.g., Tylenol) to naproxen (e.g., Aleve), which took "some of the edge off the pain." *Id.*

- On September 30, 2019, the sports medicine specialist recorded that while Petitioner's adhesive capsulitis was improving – with increased ROM and no remaining impingement signs – she had persistent pain consistent with tendinopathy "correlat[ing] to the supraspinatus footprint" as evidenced on ultrasound. Ex. 3 at 128-30. The sports medicine specialist offered a subacromial steroid injection, which Petitioner declined on her belief that it would not be effective. *Id.* at 130. She would see an orthopedist for a second opinion. *Id.*

- At the November 26, 2019, initial evaluation, orthopedist Sean Christopher Adelman, M.D. reviewed Petitioner's history of post-vaccination left shoulder pain including her "pictures of the ecchymosis which occurred a few centimeters off the anterolateral aspect of her acromion when the flu shot originally occurred," and conducted a physical exam. Ex. 3 at 135. Petitioner reported that she had "quite a bit of pain for a long period of time," but had "made quite a bit of progress with massage and physical therapy," and that the steroid injection "helped demonstrably as well." *Id.*
- Dr. Adelman assessed "flu vaccine-related subacromial bursitis" and secondary adhesive capsulitis. *Id.* He opined that in a "thin female" such as Petitioner, an injection administered "a bit more superiorly… allows the needle to penetrate the subacromial space." *Id.* Dr. Adelman continued: "Although the immunologic reaction to the needle is normal and is dealt with a good vascular supply in the

deltoid muscle, the subacromial space is relatively avascular, so it creates an inflammatory response with lessened ability to remove the inflammatory debris which results in an immune-mediated subacromial bursitis which typically resolves of its own accord, but occasionally cannot." *Id.* at 135-36. The plan was to continue physical therapy, acupuncture, and massage and follow up in 6-8 weeks. Ex. 3 at 136; *see also id.* at 139-40 (email updates on her condition).

- At a December 23, 2019, primary care appointment, Petitioner received a flu vaccination in her left shoulder. Ex. 12 at 19-22, 41. The visitation note did not mention shoulder pain. *Id.* at 19-22.

- At a January 9, 2020, orthopedics follow-up, Petitioner reported that her left shoulder felt 80-85% better and she was hopeful for further improvement. Ex. 12 at 23. A physical exam documented improved but still limited ROM. *Id.* at 23-24. The orthopedist commented that Petitioner was "slowly but surely getting better, but… not where she need[ed] to be." *Id.* at 24. The plan was to continue with home exercises and stretching, follow up in a couple of months, and consider surgery if her symptoms continued. *Id.*

- On October 24, 2020, Petitioner underwent an annual physical. Ex. 17 at 4. She reported persistent left shoulder pain and limited ROM. *Id.* at 11. She wished to restart massage therapy, physical therapy, and acupuncture. *Id.* at 8. She was administered a flu vaccine in her left shoulder. *Id.*

- On May 17, 2021, Petitioner presented for massage therapy at a new provider, Pain-Free Solutions. Ex. 18 at 1. On the intake form, she identified her main complaint to be her left shoulder pain, currently rated at 3/10. *Id.* Petitioner reported that she had not been receiving treatment due to the COVID-19 pandemic. *Id.* An examination documented pain with arm elevation and rotation. *Id.*

- **Affidavits.** Petitioner denied any pre-vaccination left shoulder pain, lost ROM, or injury. Ex. 1 at ¶ 4. She recalled receiving the vaccination on Monday, October 1, 2018, at approximately 3:30 p.m. *Id.* at ¶ 5. It caused immediate pain, bleeding, and bruising at the injection site, for which the pharmacist told her to apply ice and take over-the counter ibuprofen. *Id.* at ¶ 9.
- Petitioner recalled that "the following morning… during [her] first morning break at [her] job" at the elementary school, she presented to the onsite registered nurse ("RN"). Ex. 1 at ¶¶ 11-12. The RN confirmed that sometime "in the fall of 2018," Petitioner displayed left shoulder/ upper arm pain, redness, and swelling which she attributed to a recent flu shot. Ex. 16 at ¶ 4. The RN explained that school policy

restricted her to formal treatment of students; therefore, she did not create any written record of, or provide any formal treatment for, Petitioner's complaint. *Id.* at ¶ 4. The RN recalled telling Petitioner to apply ice and "seek treatment if the pain continued" during this first interaction, and again at a later date. *Id.* at ¶¶ 4-5. The RN denied knowledge of any prior history or other cause of Petitioner's left shoulder pain. *Id.* at ¶¶ 5-7.

- Petitioner recalled that over the next few weeks, the pain "lessened" and was "manageable" including during her daily yoga practice. Ex. 1 at ¶ 14. However, "by the end of [2018] and into the beginning of [2019]," the pain still woke her up during the night and was so "unbearable" overall that she determined to find a new PCP. *Id.* at ¶ 15. She recalled making the "earliest available appointment" for February 6, 2019; her dissatisfaction with that provider; and that massage and chiropractic treatment did not deliver lasting relief. *Id.* at ¶¶ 17-24. She recalled receiving the cortisone injection on July 24, 2019, but she did not address its efficacy. *Id.* at ¶¶ 25-27 (original affidavit dated March 3, 2020). In her supplemental affidavit dated May 17, 2022, Petitioner asserts that she cannot raise her left arm more than 90% without discomfort. Ex. 19 at ¶ 5. She can no longer bear any weight on her shoulder while exercising or participating in yoga, and she has lost upper body strength. *Id.* Based on this injury, she has foregone her personal yoga practice, leading a daily class for students at her elementary school, and plans to establish her own business. *Id.* at ¶ 4. Petitioner stated that "was not able to do all the treatments [she] wanted to do" based on the financial costs of deductibles, copays, and pain medications. *Id.* at ¶ 6.

## III. Entitlement

### A. Authority

Before compensation can be awarded under the Vaccine Act, a petitioner must demonstrate, by a preponderance of evidence, all matters required under Section 11(c)(1), including the factual circumstances surrounding her claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Hum. Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). Contemporaneous medical records are presumed to

be accurate. *See Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Hum. Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Hum. Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)).

In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[16] a petitioner must establish that he suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F.R. § 100.3(a)(XII)(A). The criteria establishing a SIRVA under the accompanying QAI are as follows:

> *Shoulder injury related to vaccine administration (SIRVA).* SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g., tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

---

[16] In summary, a petitioner must establish that he or she received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of her injury for more than six months, died from the injury, or underwent a surgical intervention during an inpatient hospitalization; and that he or she has not filed a civil suit or collected an award or settlement for the injury. *See* § 11(c)(1)(A)(B)(D)(E).

11

> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii) Pain occurs within the specified time frame;
>
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and
>
> (iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g., NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

## B. Application

After a review of the entire record, I find that a preponderance of the evidence supports that Ms. Gibson has established entitlement for a Table SIRVA.

### 1. Range of Motion

Respondent argued that the QAI requires a petitioner to establish both "shoulder pain *and limited range of motion*." Response at 2 (citing 42 C.F.R. § 100.3(c)(10) at Introduction and (ii) (emphasis added)).[17] Because in statutory interpretation, "every word of a statute must be given effect if possible," "statutory phrases separated by the word 'and' are usually interpreted in the conjunctive." *Id.* (internal citations omitted). Petitioner briefly disputed any such requirement for limited ROM. Reply at 2. Indeed, it has previously been questioned. *See Portee v. Sec'y of Health & Hum. Servs.*, No. 16-1552V, 2018 WL 5284599, *11 (Fed. Cl. Spec. Mstr. Sept. 14, 2018) (stating that limited ROM "*could be deemed an additional requirement in the QAI*") (emphasis added); *Dawson v. Sec'y of Health & Hum. Servs.*, No. 19-0278V, 2021 WL 5774655 at *2 (Fed. Cl. Spec. Mstr. Nov. 4, 2021) (reasoning that the introductory paragraph contained "some

---

[17] Respondent did *not* argue that limited ROM must begin alongside the shoulder pain for which onset must be within forty-eight (48) hours after vaccination. Response at 2-4. This argument has previously been rejected. *See, e.g.*, *Portee v. Sec'y of Health & Hum. Servs.*, No. 16-1552V, 2018 WL 5284599, *11 (Fed. Cl. Spec. Mstr. Sept. 14, 2018) ("There is… no requirement regarding the timing of the onset of the limited ROM"); *accord Rodgers v. Sec'y of Health & Hum. Servs.*, No. 18-0559V, 2021 WL 4772097, at *8 (Fed. Cl. Spec. Mstr. Sep. 9, 2021).

ambiguity," and that subclause (ii) "could be understood only to define the *locus* of range of motion issues" when they are present).

I find it unnecessary to revisit this legal question in light of the specific case evidence. Respondent correctly noted the first medical evaluation, occurring four months post-vaccination, in which the new PCP recorded that shoulder ROM was normal. Response at 3 (citing Ex. 2 at 7, 15-17). Respondent then argued that ROM was not found to be limited until seven and one-half months, which he argued, would not be reasonably attributed to the vaccination. *Id.* at (citing Ex. 4 at 23). But the latter record was in fact *five and one-half months* into the course, on March 14, 2019. Reply at 1-2. Even setting aside Petitioner's documented complaints about the PCP (which give rise to an argument that ROM *was* limited, but not documented, during that encounter), the March 2019 record establishes limited ROM within the first six months of the vaccination which was not attributed to any alternative cause. I have also recognized that SIRVA findings can evolve over time. *Accord Rodgers v. Sec'y of Health & Hum. Servs.*, No. 18-0559V, 2021 WL 4772097, at *8 (Fed. Cl. Spec. Mstr. Sep. 9, 2021) (stating that "reductions in [ROM]… often lag after the initial injury by weeks or months"). Thus, even if the QAI requires proof of limited ROM, it need not manifest at the *same time* as pain (which the QAI clearly mandates must manifest in a specified timeframe). Petitioner has established this QAI criteria.[18]

### 2. Prior History

Another issue to be resolved is whether Petitioner's prior medical history would explain her post-vaccination shoulder complaints. Response at 4-7 (citing 42 C.F.R. § 100.3(c)(10)(i)). As reviewed above, Petitioner previously reported stress, anxiety, and cervicalgia involving both shoulders, for which she received five massage therapy sessions concluding in June 2017. I recognize the lack of a formal discharge from massage therapy or other positive medical record documentation that those complaints were "completely relieved," Response at 6. But based on the lack of further medical treatment for approximately fifteen (15) months, as supplemented by the affidavits, even if Petitioner's cervicalgia persisted to some extent, it did not involve her left shoulder.

Overall, the evidence supports the conclusion that after the October 2018 vaccination, Petitioner sustained a new injury of vaccination site bruising, initial site pain,

---

[18] Respondent also argued that if Petitioner could not establish limited ROM within the first six months after vaccination, "then consequently, she cannot establish that she suffered the residual effects of said SIRVA for six months or more." Response at 4 (citing Section 11(c)(1)(D)). However, I find that the record supports both pain and limited ROM within and continuing beyond six months of vaccination.

and more persistent pain localized at the shoulder joint. *See, e.g.*, Ex. 4 at 21, 23; Ex. 6 at 10; Ex. 7 at 3-4; Ex. 16 at 1-2. She resumed medical treatment for that specific reason. The chiropractor again treated for cervicalgia (his specialty), and even suggested that it was somewhat secondary to her shoulder injury. Regardless, even the chiropractor recognized the left shoulder pain as the separate and "primary" diagnosis. Ex. 6 at 10, 32, 37-38.

Respondent also argued that Petitioner's post-vaccination symptoms "resolved" with massage and chiropractic treatment, but then "started again after doing a pulling motion" in June 2019. Response at 6, citing Ex. 2 at 29 (PA's history of present illness); *see also* Ex. 3 at 74 (sports medicine specialist's record repeating this history nearly verbatim, upon referral from the PA). But other contemporaneous records do not support a *resolution* of symptoms but instead, an ongoing injury that was "aggravated" with awkward movement. Ex. 6 at 25, 29. Based on a full review, the evidence does not preponderantly support the conclusion that Petitioner's prior history would explain her post-vaccination shoulder injury.

### 3. Injury Localized to Shoulder

Finally, to establish a Table SIRVA, a petitioner must establish pain and reduced ROM were "limited to the shoulder in which the intramuscular vaccine was administered." 42 C.F.R. § 100.3(c)(10)(iii). However, this requirement "does not prevent a petitioner with simultaneous areas of pain due to unrelated conditions from also meeting the Table definition." *Rodgers v. Sec'y of Health & Hum. Servs.*, No. 18-0559V, 2021 WL 47772097, at *8 (Fed. Cl. Spec. Mstr. Sept. 9, 2021).

Here, Respondent emphasized that at the first medical evaluation four months post-vaccination, Petitioner was recorded to have pain at various sites that "tend[ed] to travel, not always in the same place." Response at 7 (citing Ex. 2 at 15-16). The recorded *complaints* are admittedly problematic for Petitioner – but may be viewed in the context of a broad new patient evaluation. Importantly, the provider's *assessment* and treatment plan were ultimately focused on shoulder pain. Ex. 4 at 17, 21; *accord* Ex. 2 at 45-46 (Petitioner's subsequent complaint that the provider had not properly documented that her chief concern was left shoulder pain since the flu vaccine). And overall, the medical records consistently reflect a new injury localized to the left shoulder.

In finding that this Table criteria has been fulfilled, I stress that unrelated conditions must be separated out from the damages attributable for a Table SIRVA. *Rodgers*, 2021 WL 47772097 at n. 16; *see also Knudsen v. Sec'y of Health & Hum. Servs.*, No. 18-1971V, 2021 WL 4448738, at *5 (Fed. Cl. Spec. Mstr. Aug. 23, 2021) ("distinguishable injuries are not an additional basis for recovery"). Here, the Table SIRVA does not extend to elbow

pain or to any aggravation of previously documented cervicalgia – and thus consideration of such matters will be omitted from the damages award discussed further below.

## IV. Damages

### A. Authority

In a recent decision, I discussed at length the legal standard to be considered in determining damages and prior SIRVA compensation within SPU. I fully adopt and hereby incorporate my prior discussion in Sections II and III of *Friberg v. Sec'y of Health & Hum. Servs.*, No. 19-1727V, 2022 WL 3152827 (Fed. Cl. Spec. Mstr. July 6, 2022).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[19]

### B. Appropriate Compensation for Pain and Suffering

In this case, awareness of the injury is not disputed, leaving only the severity and duration of that injury to be considered. When performing this analysis, I review the record as a whole to include the medical records and affidavits filed and all assertions made by the parties in written documents. I consider prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases. However, I base my determination on the circumstances of this case.

Ms. Gibson avers that her October 1, 2018, vaccination caused past pain and suffering which warrants an award of $80,000.00. Motion at 23. She emphasizes her initial injection site bleeding and bruising, prompt presentation to the school RN, persistent pain, and progressive loss of ROM. *Id.* at 20. She states that her medical encounters and her characterizations of pain throughout the medical records illustrate a considerably long and severe course. *Id.* at 21-22 (citing medical records dating through January 2020, and

---

[19] *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

followed by the May 17, 2021, massage therapy reevaluation). Petitioner avers that her pain and suffering has been longer and more severe than past SIRVAs which were compensated between $75,000.00 - $80,000.00.[20]

Respondent contends that Petitioner's proposed award is too high – without offering an alternative number, reaction to Petitioner's cited cases, or comparison to any other cases. Response at 8. Importantly, the above entitlement analysis eliminates several of Respondent's arguments for a lower damages award. *Id.*[21]

A careful review of the medical records supports the conclusion that Ms. Gibson's initial injury was mild to moderate. I recognize her later recollection that the initial post-vaccination pain was severe, and that she more likely than not presented to the school RN approximately one day later. However, the school RN was unable to treat Petitioner and urged her to seek out other care. Over the next few weeks, the pain became manageable with conservative measures and activity modification. In total, Petitioner delayed formal medical treatment for four months, of which only a few weeks is reasonably attributable to locating and scheduling with the new PCP – indicating a less severe injury.

As referenced above, Petitioner's compensable injury is limited to a Table SIRVA. Some of the early treatment was not confined to that injury, and therefore it should receive less weight when calculating pain and suffering to be awarded. *See, e.g.*, Ex. 4 at 23-24 (massage therapy also addressing left elbow tightness and soreness); Ex. 6 at 9-35 (chiropractic treatment also addressing cervicalgia); *accord Friberg*, 2022 WL 3152827, at *4 (noting that lower pain & suffering awards are made to petitioners who "suffered from unrelated conditions to which a portion of their pain and suffering could be attributed").

Petitioner's treatment course was otherwise conservative. The most significant intervention she received was probably the steroid injection – which was followed by significant pain relief (at least temporarily), improvements in ROM, and discontinuation of formal PT (after 3 sessions total). Despite a subsequent increase in pain, she was at least

---

[20] *Kent v. Sec'y of Health & Hum. Servs.*, No. 17-0073V, 2019 WL 5579493 (Fed. Cl. Spec. Mstr. Aug. 7, 2019) (awarding $80,000.00 for actual pain and suffering); *Goring v. Sec'y of Health & Hum. Servs.*, No. 16-1458V, 2019 WL 6049009 (Fed. Cl. Spec. Mstr. Aug. 23, 2019) ($75,000.00); *Pruett v. Sec'y of Health & Hum. Servs.*, No. 17-0651V, 2019 WL 3297083 (Fed. Cl. Spec. Mstr. Apr. 30, 2019) ($75,000.00).

[21] Specifically, I have not accepted Respondent's arguments that Petitioner had "unresolved" left shoulder pain prior to vaccination; that she lacked limited ROM at any point within six months after vaccination; and that her post-vaccination injury "resolved" and was followed by a subsequent injury caused by an awkward "pulling motion." *See* Response at 8. However, I agree that Petitioner delayed in seeking treatment for four months and that her treatment course was conservative overall.

80-85% better by January 2020 (13 months into the course) and continued with only conservative measures (over-the-counter pain medications, acupuncture, and massage). I recognize that Ms. Gibson's SIRVA may well have caused residual limited ROM and pain, but the available evidence supports the conclusion that she has generally achieved a good recovery.[22]

I have also taken into account Petitioner's cited comparable cases. In *Pruett*, the petitioner established "severe" pain for approximately the first two and one-half months via the first medical presentation just 12 days into the course, documented early losses in ROM, prescription-strength pain measures, and early MRI.[23] 2019 WL 3297083, at *2-3, 9. Ms. Gibson's initial pain, however, was mild to moderate, reducing the value of this comparable. Otherwise, direct comparisons with *Pruett, Goring*, and *Kent* are difficult because Ms. Gibson's case involved a steroid injection – which demonstrated the severity of her pain at that juncture, and also delivered meaningful if not total improvement in her condition.

I find Petitioner's circumstances to be more similar to other individuals who initially delayed medical attention, improved with cortisone injection(s) and other conservative measures, and actively treated for no more than one year. *See, e.g., Bergstrom v. Sec'y of Health & Hum. Servs.*, No. 19-0784V, 2021 WL 5754968 (Nov. 2, 2021) (awarding $80,000.00 for actual pain and suffering); *Lambert v. Sec'y of Health & Hum. Servs.*, No. 19-1335V, 20222 WL 1487253 (Fed. Cl. Spec. Mstr. March 29, 2022) ($73,000.00). Petitioner's proposed figure falls within that range. **Based on the particular facts and circumstances of this case, an award of $75,000.00 is therefore appropriate for Petitioner's actual pain and suffering.**

## C. Appropriate Compensation for Unreimbursed Expenses

Petitioner seeks $2,187.31 in out-of-pocket costs for medical treatment of her SIRVA, and the related travel to and from her home. Motion (ECF No. 49)[24] at 19. She provides calculation of her mileage for each journey, multiplied by the IRS "business rate"

---

[22] Petitioner does not claim – nor I do find sufficient evidence to conclude – that she would have pursued additional formal treatment but for the COVID-19 pandemic.

[23] Petitioner inadvertently stated that *Pruett* did not involve an MRI. Motion at 22; *but see* 2019 WL 3297083, at *3.

[24] Petitioner states that she "attached" her "Itemization and Documentation of Past Unreimbursable Expenses" and other supporting documentation to the Motion. However, she filed all components as part of the main PDF at ECF No. 49. Therefore, all citations are to the pagination on the top of the PDF (pages 1 – 51).

17

for the relevant year. *Id.* at 24.[25] She states that special masters have previously found that the "business rate" is appropriate for use in this context. *Id.* (citing *Williams v. Sec'y of Health & Hum. Servs.*, No. 90-2239V, 1996 WL 608455 (Fed. Cl. Spec. Mstr. Oct. 10, 1996); *accord Ashe-Robinson v. Sec'y of Health & Hum. Servs.*, No. 94-1096V, 1997 WL 54350 (Fed. Cl. Spec. Mstr. Jan. 23, 1997)). Respondent does not dispute any of the medical expenses or the general proposition of reimbursing the related travel. Response at 7-8. He only suggests that the IRS's lower "medical" rate is applicable within the Vaccine Program. *Id.* at 8 (lack of citations in the original).[26]

However, Respondent offers no rationale for diverging from *Williams* – in which then-Special Master Hastings explained that Congress created a tax deduction for medical mileage in limited circumstances involving "extraordinarily heavy medical expenses," and that this rate is intended to cover only vehicle operating expenses (i.e., gasoline and oil). *Williams*, 1996 WL 608455, at *2. The special master reasoned that the Vaccine Program's reimbursement of out-of-pocket costs involves a "very different calculation… measur[ing] the *actual cost* to the petitioner of the injury." *Id.* (emphasis added). Thus, the special master found it appropriate to apply the more generous business mileage rate, encompassing not only vehicle operating expenses but other fixed costs ("depreciation, maintenance, repairs, tires, insurance, and registration fees"). *Id.*

**Based on such persuasive prior case law, Respondent's lack of additional argument, and specific circumstances in this case,[27] I award the requested mileage costs and the other uncontested expenses – totaling $2,187.31.**

## V. Conclusion

Based on the record as a whole and both parties' arguments, Petitioner's Motion for a Ruling on the Record (ECF No. 49) is **GRANTED.** Petitioner is entitled to compensation for a Table SIRVA, and she is awarded reasonable compensation in the

---

[25] The *Williams* decision, cited herein, identifies the statutory authority for the "business" rate as Internal Revenue Code (hereinafter "I.R.C.") § 162. Specific figures are at Internal Revenue Service, *Standard Mileage Rates*, available at https://www.irs.gov/tax-professionals/standard-mileage-rates (last accessed September 27, 2022).

[26] *Williams* identifies the statutory authority for the "medical" rate as I.R.C. § 213. Specific figures are at the same website cited *supra* at note 24.

[27] Ms. Gibson has provided sufficient documentation that she personally incurred the travel expenses in her own vehicle and in relation to the vaccine injury. Motion at 24-34; *see also* Ex. 21. *Compare Morgan v. Sec'y of Health & Hum. Servs.*, No. 20-1286V, 2022 WL 4717958 (Fed. Cl. Spec. Mstr. Sept. 2, 2022) (denying mileage costs to an undergraduate student who may have been transported by his parents and in conjunction with travel to his university), and additional cases cited therein.

amount of **$77,187.31 (representing $75,000.00 for actual pain and suffering[28] and $2,187.31 for actual unreimbursed expenses).** This amount represents compensation for all damages that would be available under Section 15(a). The Clerk of the Court is directed to enter judgment in accordance with this Decision.[29]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[28] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* § 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[29] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.